## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In re:<br><br>KENNETH A. BELLOWS,<br><br>                 Debtor. | Case No. J15-00245-GS<br>Chapter 11<br><br>[Lead Case - Jointly Administered] |
| In re:<br><br>FLY-IN-FISH INN, INC.,<br><br>                 Debtor. | Case No. J15-00246-GS |

## MEMORANDUM ON PLAN CONFIRMATION and
## FIRST BANK'S MOTION FOR RELIEF FROM STAY[1]

Hearings on approval of debtors Kenneth Bellows' and Fly-In-Fish, Inc.'s joint Disclosure Statement, confirmation of the debtors' Plan of Reorganization, and First Bank's Motion for Relief From Stay, were held on March 8 and 16, 2016. The court has thoroughly considered the evidence presented and the arguments of counsel. For the reasons stated below, the court will deny final approval of the debtors' Disclosure Statement and confirmation of the Plan. The court will also deny First Bank's Motion for Relief From Stay, and shall set a status conference to discuss how the case should proceed in light of this decision.

## I.    CASE BACKGROUND.

On August 17, 2015, debtors Kenneth Bellows and Fly-In-Fish Inn, Inc., separately filed voluntary chapter 11 petitions. An order for joint administration was subsequently entered, and the debtors now seek confirmation of a joint Plan of Reorganization. Their major secured

---

[1] In this Memorandum, all references to "Section" or "§" are to provisions of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, unless otherwise indicated.

creditor, First Bank, opposes confirmation and seeks relief from stay.  All other classes of creditors, including the general unsecured creditors in Class 1, support confirmation of the Plan.[2]

The debtors' business revolves around the Fly-In-Fish Inn ("the Inn"), a mixed use property located on the waterfront in Sitka, Alaska, that includes a small hotel, a restaurant and bar, and some rental apartments.[3]  Two related, non-debtor entities are also involved in the Inn's operation – Air Sitka, Inc. ("Air Sitka") and Pilot House, Inc. ("Pilot House").

Mr. Bellows, his sister, Marlys Dee Hanson, and their brother Ronald D. Bellows, created the debtor entity Fly-In-Fish Inn, Inc. ("FIFII"), for the purpose of running the hotel.  The Inn also operates a restaurant, which serves alcohol under a liquor license held by the Pilot House.  The Inn was built, and the business was opened, roughly ten years ago.  First Bank provided the funds to construct the Inn.  Presently, the real property on which the Inn is located is jointly owned by Mr. Bellows and his sister, Marlys Dee Hanson.[4]  First Bank holds a first deed of trust on the realty, and a security interest in the debtors' business personal property.  Mr. Bellows and Ms. Hanson are guarantors on this loan, as well.  As of the date the petitions were filed, the total due on the loan was $1,792,051.48.[5]

---

[2] Unsecured creditor James McGowan initially voted to reject the Plan, and filed an opposition to confirmation.  Mr. McGowan attended the March 8 hearing, and during the hearing withdrew his objection to confirmation.

[3] The Inn itself has 10 guest rooms, plus two residential apartments, one of which is currently occupied by Mr. Bellows.  The restaurant and bar, on the first floor of the Inn, will seat 42 customers.  In addition, the business has two residential duplex units, and there are also two residential apartments on the second floor of the building located on the tidelands float where Air Sitka operates.  An office space for Air Sitka is on the first floor of this building.

[4] Ken Bellows' brother, Ron, initially held an interest in the real property as well, as reflected by First Bank's Deed of Trust, which was executed by Ken Bellows, Ron Bellows, and Marlys Hanson.  According to Ken Bellows, he currently owns two-thirds of the realty, and Ms. Hanson owns the remaining one-third interest.

[5] *See* First Bank's Proof of Claim No. 7-1, filed in Main Case No. J15-00246-GS.

The Inn is situated on real property abutting tidelands property that Mr. Bellows leases, individually, from the City and Borough of Sitka ("Sitka").  First Bank also holds a security assignment of the Sitka tidelands lease as further collateral for its loan.  Mr. Bellows operates an air taxi service through non-debtor Air Sitka, out of a two-story building on a float he owns that is situated on the leased tideland property.[6]  Mr. Bellows is the sole shareholder of Air Sitka. The air taxi business preceded the Inn.  It operates in a symbiotic relationship with the Inn, as each generates business for the other.  Air Sitka does not pay rent for the use of either the float or the tidelands property.[7]

The debtors' schedules, and Disclosure Statement, reflect that Ken Bellows is the sole shareholder and owner of all three corporate entities involved in the Inn's operation – corporate debtor FIFII, Air Sitka, and the Pilot House, the entity that owns the liquor license used in the Inn's restaurant and bar.  First Bank has challenged these representations.[8]  When questioned as to the present ownership of debtor FIFII and the Pilot House, Mr. Bellows conceded that his sister still owns a one-third interest in both, but indicated that she had agreed not to take anything on account of her interest.[9]  Ms. Hanson is not listed as a creditor or equity holder in the debtors' schedules, but has participated in the bankruptcy to some degree.  She has written two letters

---

[6] Air Sitka owns one aircraft with an estimated value of $200,000.00.  This asset is encumbered by liens totaling $100,000.00, held by two of Mr. Bellows' creditors.

[7] The debtors' business history is more fully described in the Disclosure Statement, and is essentially undisputed.

[8] Attached to First Bank's Combined Objection to Disclosure Statement and Plan Confirmation is a copy of Air Sitka's 2015 Biennial Report, which reflects that Mr. Bellows is the sole shareholder of the corporation.  First Bank also provided a copy of Air Sitka's articles of incorporation, which list Ms. Hanson as one of the original incorporators of this entity.  *See* Exs. M and N to First Bank's Combined Obj., ECF Nos. 66-14, 66-15.  Yet, there is no evidence that directly contradicts Mr. Bellow's testimony that he alone owns Air Sitka.  His testimony is implicitly confirmed by Ms. Hanson, who has asserted ownership interests in both the Inn and Pilot House, but not in Air Sitka.

[9] Ms. Hanson's interest in the Inn *realty* was disclosed in the Disclosure Statement.  Mr. Bellows testified that his other sibling, brother Ron Bellows, has quitclaimed his interest in the realty and the three corporate entities to him.

3

regarding this proceeding, which indicate that she attended the § 341 meeting of creditors, and is aware of the joint debtors' efforts to reorganize.[10]  The letters do not renounce her interests in either FIFII or the Pilot House.

Ms. Hanson is not only a co-owner of the Inn.  She also managed the Inn until September of 2012.[11]  The Disclosure Statement attributes the debtors' bankruptcy filing to poor management by Ms. Hanson, coupled with the 2007 economic recession, which negatively impacted the tourism industry in Southeast Alaska.  After Ms. Hanson ceased managing the Inn, the debtor borrowed money from friends and acquaintances to keep the business afloat.  First Bank commenced a non-judicial foreclosure in 2015.  The two bankruptcy petitions were filed one day prior to the scheduled foreclosure sale.

The debtors' Plan proposes to continue operation of the Inn while marketing the business for sale, with the ultimate goal of selling the Inn by January 31, 2021.  With the exception of Mr. Bellows' equity interest, placed in Class 7 of the plan, all classes of claims are impaired.  The secured claim of First Bank, the sole Class 2 creditor, is allowed in the amount stated on its proof of claim, $1,792,051.00.  But, under the plan, the loan period is extended by two years, the interest rate is reduced from 7% to 6%, and the monthly payments are reduced from $18,500.00 to $18,000.00.[12]  The payment schedule is also shifted, to provide for no monthly payments in the months of January through March, rather than the current schedule which excuses payments from December through February.  First Bank's claim is to be paid in full on sale of the Inn.

---

[10] ECF Nos. 63, 81.

[11] This date is per Ms. Hanson's letter (ECF No. 63).

[12] The loan terms were modified in December 2013, to provide for nine monthly payments of $18,500.00, made during the months of March through November, and no monthly payments in the months of December, January, and February.  Interest was fixed at 7%, and the maturity date was extended from December 5, 2013, to December 4, 2018.  *See* First Bank's Proof of Claim No. 7-1, Part 5, filed in Case No. J15-00246-GS.

4

Other secured creditors, junior to First Bank, are individually separated into Classes 3, 4, 5, and 6. They receive similar treatment, e.g., their claims are allowed as filed, but the interest rate and/or payment terms have been adjusted. Further, the Plan does not guarantee full payment to these creditors; their recovery depends on the price at which the Inn is ultimately sold, and is capped by the available proceeds net of closing costs, taxes, and First Bank's debt. These creditors have not objected to their proposed treatment under the Plan, however.

The joint debtors also have $154,391.00 in priority tax debt that they propose to pay, with interest, over a five year term, or whenever the Inn is sold. Finally, the general unsecured creditors, placed in Class 1, are to receive four annual payments, commencing January 1, 2018, and continuing until January 1, 2021. The first two payments will be equal to 2% of the Inn's gross revenue for the preceding year, and the second two payments will increase to 4% of the Inn's gross revenue. The annual payments will be prorated among the allowed claims within Class 1, but will terminate if the Inn is sold before 2021. On sale of the Inn, the Class 1 unsecured claims will receive a pro-rata distribution of 50% of the net proceeds, after payment of closing costs, and of all secured, administrative, and priority claims. The Plan explains that unsecured creditors could potentially receive 100% of their claims, if the Inn and tidelands lease can be sold for at least $2.8 million.

First Bank is the only creditor who voted to reject the Plan, and objected to final approval of the Disclosure Statement and confirmation.[13] It also seeks relief from stay under § 362(d)(2). It notes that, in addition to its first deed of trust, there are several other liens against the Inn. First Bank argues there is no equity in the Inn, and that it is not necessary for reorganization

---

[13] As observed *supra* note 2, at 2, unsecured creditor James McGowan, who initially opposed confirmation and voted to reject the Plan, withdrew his objection to confirmation on the record at the March 8 hearing. While Ms. Hanson has filed letters that criticize her brother and his reorganization efforts, she does so in the capacity of an "interested party and co-owner" of the Inn. *See* ECF Nos. 63, 81. She has not filed a Proof of Claim in either of the jointly administered bankruptcy cases, nor has she objected to confirmation of the Plan.

5

because the debtors's Plan proposes sale of this asset in any event.  First Bank contends the fair market value of the Inn is $1,750,000.00, based on an October 2015 appraisal performed by Ken Wold, MAI, of Alaska Appraisal Associates, Inc.  At this value, it argues it is undersecured, the debtors' Plan is not feasible, and it should be granted relief from the automatic stay to proceed with its foreclosure of the debtors' real and personal property.

## II.   DISCUSSION.

### A.   Adequacy of Disclosure Statement.

Under § 1125(b), a debtor cannot solicit acceptance of a plan unless its disclosure statement is first approved by the court as having "adequate information," which is:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan.[14]

The debtor bears the ultimate burden of proving the adequacy of its disclosure statement.[15]

Both Mr. Bellows and FIFII are small business debtors.  The Disclosure Statement was conditionally approved by this court in accordance with § 1125(f)(3), by Order entered at ECF No. 61, with final approval to be considered contemporaneously with plan confirmation.  First Bank is the only party who has objected to the adequacy of the Disclosure Statement.[16]  It contends the document lacks sufficient historical financial data to explain how the debtors arrived in, or will emerge from, bankruptcy.  It argues the debtors have failed to sufficiently

---

[14] *In re Indian Nat'l Finals Rodeo, Inc.*, 453 B.R. 387, 399 (Bankr. D. Mont. 2011)(citing *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 718-19 (Bankr. E.D. Cal. 1992)); *see also* 11 U.S.C. § 1125(a)(1).

[15] *In re Alaska Fur Gallery, Inc.*, 2011 WL 4904425, at *2, 10 ABR 107, 111 (Bankr. D. Alaska Apr. 29, 2011)(citing *In re Michelson*, 141 B.R. at 718-19).

[16] Mr. McGowan withdrew his objection on the record, at the March 8 evidentiary hearing.

explain Ms. Hanson's interest in the Inn, and the Pilot House. First Bank further asserts the Disclosure Statement inadequately discloses the relationship of Air Sitka and the Pilot House to the Inn's business, and that it does not provide verified financial information.[17]

"[T]he determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."[18] The debtors do not deny that the Disclosure Statement inaccurately reflects FIFII's ownership, or that of the Pilot House, as being solely owned by Ken Bellows. The Disclosure Statement does disclose Ms. Hanson's one third interest in the real property, which is encumbered by First Bank's deed of trust. Mr. Bellows' testimony has also clarified the ownership of FIFII and the Pilot House, and recognizes Ms. Hanson's ownership interests in these entities.

The debtors' ability to perform its obligations under Plan ultimately depends upon the sale of the Inn. Such sale presumably includes the Pilot House's liquor license, which is presently being used in the Inn's operation. Mr. Bellows' assurances that his sister has renounced her interests in these entities provide little comfort, much less a basis to confirm a plan of reorganization. Ms. Hanson's letters suggest that she has not released her interests, and that she would claim entitlement to her share of the proceeds from the sale of any assets in which she has a direct, or indirect, ownership interest. Yet, the debtors have assumed a right to disburse the entirety of the sale proceeds in accordance with their proposed Plan despite conceding her interests in the entities and real property.

_____

[17] First Bank also insists the Disclosure Statement is inadequate because fails to accurately describe Mr. Bellows' 2006 transfer of "the Ring Island property" to Ms. Hanson. However, Mr. Bellows' amended Statement of Financial Affairs disclosed that ALPS Federal Credit Union foreclosed its interest in this realty in August of 2014. Given that the property is not an asset of the bankruptcy estate, Mr. Bellows' earlier transfers of this property are immaterial to the issues presented here.

[18] *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 193 (B.A.P. 9th Cir. 2003)(quoting *In re Texas Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988)).

7

The existence of Ms. Hansen's interests, and her expectations from any sale of the Inn, are significant to the success of the Plan. The Disclosure Statement fails to adequately disclose the basis for the debtors' belief that they are entitled to apply 100% of the proceeds from sale of the Inn towards plan payments. Assuming Mr. Bellows is correct, and Ms. Hanson wants nothing from the sale, this arrangement should be formalized, or at the very least somehow verified. If he is incorrect, however, the Disclosure Statement misrepresents the projected plan distribution to junior secured creditors, as well as priority and general unsecured creditors, because her one-third interest will detrimentally affect the payout to these classes of claims. The court finds this omission to be material, and cannot approve the Disclosure Statement absent a discussion of Ms. Hanson's interests and their impact on any potential distribution.

**B.    Confirmation of Plan.**

Absent final approval of the Disclosure Statement, the court cannot confirm the Plan as proposed. However, the court will also address First Bank's objections to confirmation, because this will likely affect how the parties proceed, and the issues raised are intertwined with First Bank's Motion for Relief from Stay.

The bankruptcy court has an affirmative duty to ensure that a plan satisfies all the confirmation requirements found in § 1129.[19] Thus, the debtor must prove either:

> (1) that the Plan satisfies all [the] requirements of 11 U.S.C. § 1129(a), or (2) if the only condition not satisfied is the eighth requirement, 11 U.S.C. § 1129(a)(8), the Plan satisfies the "cramdown" alternative to this condition found in 11 U.S.C. § 1129(b), which requires that the Plan "does not discriminate unfairly" against and "is fair and equitable" towards each impaired class that has not accepted the Plan.[20]

---

[19] *Liberty Nat'l Enter. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 653 (9th Cir. 1997).

[20] *Id.*

8

The debtors, as plan proponents, have the burden of proving, by a preponderance of the evidence, that the Plan complies with all of the statutory requirements for confirmation found in § 1129.[21]

First Bank specifically challenges the feasibility of the Plan. It argues that the debtors lack functioning management and have failed to demonstrate sufficient earning power and capital structure to perform under the Plan. First Bank also objects to the Plan's proposed cram down of its claim, arguing that the debtors have failed to establish that the plan is fair and equitable as to it.

### 1.    Feasibility.

A plan cannot be confirmed unless it is feasible, meaning that confirmation "is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor."[22] Feasibility "does not require the debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy" this requirement, "so long as adequate evidence supports a finding of feasibility."[23]  To establish feasibility in the Ninth Circuit, "all a debtor need demonstrate is that the plan 'has a reasonable probability of success.'"[24]

The feasibility of the pending Plan depends upon two components: the debtors' ability to continue operations over a five year period, and their ability to sell the Inn at a sufficient price to make all of the payments required under the Plan. In essence, the Plan is a delayed liquidation with a term of five years. First Bank contends that the debtors do not have sufficient revenues

---

[21] *United States v. Arnold and Baker Farms (In re Arnold and Baker Farms)*, 177 BR 648, 654 (B.A.P. 9th Cir. 1994), *aff'd* 85 F.3d 1415 (9th Cir. 1996).

[22] 11 U.S.C. § 1129(a)(11).

[23] *Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC)*, 465 B.R. 525, 544 (B.A.P. 9th Cir. 2012)(citing *In re Brotby*, 303 B.R. at 191)).

[24] *In re Loop 76, LLC*, 465 B.R. at 544 (quoting *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1364 (9th Cir. 1986)).

9

to continue their operations pending the sale, and that the Inn cannot be sold for enough to make all required payments.

### a. The Debtors Have Sufficient Revenue to Continue Operations.

The parties have presented disparate valuations of the Inn, discussed in greater detail below.  However, the valuation experts agree that the existing business is the highest and best use of the property, assuming the business operation is viable.  The appraisers also agreed that the property is well maintained.  Mr. Bellows offered his opinion that the Inn has the cleanest rooms, restaurant, and kitchen of any hotel in Sitka, and that the Inn has a good reputation with several repeat customers.  No evidence to the contrary was presented.

The court has reviewed the debtors' federal tax returns for 2013 and 2014, as well as an unaudited 2015 P&L Statement.  The tax returns reflect an increase of roughly $57,000.00 in gross profit in 2014 over 2013.  The debtors' profit and loss statement for 2015 describes a jump in gross profit of roughly $190,000.00 from 2014, though it resulted in net profits of only $8,400.00.

Addressing the debtors' expenses, Mr. Bellows testified in some detail regarding the efforts undertaken since late 2015 to reduce expenses.  He anticipates a dramatic drop in professional expenses upon plan confirmation.  He has also taken steps to maximize the Inn's rental revenue, and is no longer subsidizing housing for family or employees.[25]  Mr. Bellows identified several other specific actions he has taken while in bankruptcy to reduce expenses,

---

[25] Mr. Bellows' mother and his sister, Ms. Hanson, vacated the two apartments they had been occupying at the Inn, rent free, in September 2015.  Mr. Bellows also testified that he no longer provides housing for employees. Those units are now rented out, long term, for $2,000.00 per unit per month. Further, with the exception of the owner's unit, which is occupied by Mr. Bellows, the other apartments at the Inn and in the Air Sitka building are also rented out long term.  The tenant apartments were recently renovated.  The Inn's utility costs have gone down because the long term tenants now pay for their utility service; the Inn previously paid tenant utilities.  Mr. Bellows testified that the rental market in Sitka is very tight, and that he has had no problem finding long term tenants for the Inn's apartments.

10

including the installation of a point of sale ("POS") system at the Inn that will enable it to track expenses and income more accurately.

As for revenue, Mr. Bellows explained how the Inn's revenue has been depressed due to poor seasons for the Alaska herring fishery. He said the success of the annual herring season impacts the demand for his rooms. The fishery was depressed in 2015, but he anticipates that the upcoming and future years would see improvement.

Mr. Bellows also testified that he recently hired a new chef and new manager, who would free his time from the management of the Inn, and allow him to focus on growing the air taxi business. The new manager is familiar with the business operation, because she previously worked at the Inn as a bartender. The new chef, who is her husband, is an experienced chef who specializes in catering, and the Inn has started catering events to supplement its revenue. Mr. Bellows testified that the Inn brought in $10,000.00 in revenue in December 2015 from this new source, and he anticipates at least $30,000.00 in additional catering revenue in 2016. While not projected to add a substantial amount of revenue, the catering operation will enable the Inn to supplement its restaurant business.

The court credits Mr. Bellows' explanation for his income and expense projections. His testimony establishes that:

- the highest and best use of the property is as currently developed;

- the tourism industry in Southeast Alaska has stabilized;

- the Inn is well maintained, has a good reputation, and has repeat customers;

- since Mr. Bellows took over management of the Inn in late 2012, gross revenues have increased annually;

- the Inn is more actively advertising its rooms, and room rates have been increased to be more comparable to other hotels in Sitka;

11

- the restaurant is now open to the public;[26]

- Mr. Bellows has hired both a new chef and a new manager for the business, which will allow him to devote more time to running Air Sitka;

- very recent changes in business operations will produce higher revenues in 2016, and provide a more steady income stream throughout the year.

The evidence supports a finding that the Inn will generate sufficient income to fund the payments required under the Plan. Gross income for the Inn has increased annually since Mr. Bellows took over management of the Inn from Ms. Hanson in late 2012. The more recent changes to business operations, set out above, support the debtors' projections for increased revenue and decreased expenses in the future. This evidence also adequately addresses the concerns expressed by First Bank as to the debtors' management and prospective earning power.

### b. The Sale of the Inn.

The debtors' plan, and payment of First Bank's secured claim, depend upon the sale of the Inn. When evaluating the feasibility of the sale of a business, courts are tasked to ensure that the debtors' plan is not "a visionary scheme which promises more than the [debtors] can deliver."[27]

The debtors' Plan is feasible if the sale of the Inn will generate sufficient proceeds to pay all secured and priority debt. The debtors submitted the appraisal and testimony of Julie Dinneen, MAI, which values the Inn at $2.8 million. In preparation for her testimony, Ms.

---

[26] According to Mr. Bellows, when Ms. Hanson was managing the Inn the restaurant was open solely to hotel guests, with a very limited menu and hours.

[27] *In re Loop 76, LLC*, 465 B.R. at 544 (quoting *Wiersma v. O.H. Kruse Grain & Milling (In re Wiersma)*, 324 V.R. 92, 112-13 (B.A.P. 9th Cir. 2005), *aff'd in part, rev'd in part on other grounds*, 227 Fed. Appx. 603 (9th Cir. 2007)); *see also Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii)*, 761 F.2d 1374, 1382 (9th Cir. 1985)("The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.").

12

Dineen prepared an "updated valuation of Fly In, Fish Inn," dated January 21, 2016.[28]  She has

some familiarity with this property; she performed an appraisal for First Bank in 2006 when the

Inn was completed.[29]  In her updated valuation, Ms. Dinneen applied the income and cost

approaches to evaluate the Inn.  She declined to use the sales comparable method of valuation.

She testified that there was insufficient available data for this method, because the Inn is a

smaller property, and otherwise unique in several respects.  Ms. Dinneen determined that the

income approach was the "most fine-tuned" method to value the property, and arrived at an

updated value of $2,870,000.00 for the Inn.

     In her income approach to valuation, Ms. Dineen estimated the debtors' annual income

at $1,069,769.00,[30] the cost of goods at $218,010.00, and total combined expenses at

$732,260.00.  She applied a capitalization rate of 11.8% to arrive at her updated valuation of

$2,800,000.00.  Her figures for annual income, cost of goods, and operating expenses are

inconsistent with the debtors' historical numbers, including those from their 2015 profit and loss

statement.

     First Bank contends the fair market value of the Inn is limited to $1,750,000.00.  Its

valuation is based on an October 2015 appraisal performed by Ken Wold, MAI, of Alaska

Appraisal Associates, Inc.  Mr. Wold has also appraised the property previously.[31]  Unlike Ms.

Dinneen, he applied the sales comparable approach in his appraisal, though he acknowledged

a lack of comparable sales.  He found only two other comparable sales in Sitka, where the Inn

---

[28] Disclosure Statement, Ex. 4 (ECF No. 57-3).

[29] Ms. Dinneen's 2006 appraisal is not part of the record.  The Disclosure Statement represents that the 2006 appraisal valued the property at $2,535,000.00, and estimated a stabilized value of $2,820,000.00 for the Inn at year 4 of operations.  *See* Disclosure Statement, ECF No. 57 at 6-7.

[30] Ms. Dineen included revenue from rental of the six moorage stalls on the float used by Sitka Air, although Mr. Bellows testified that he has never charged rent for those stalls.

[31] Mr. Wold appraised the property in 2011 as well.

is located.  One was in 2008 and the other in 2013, and both were larger and older than the Inn.

The other comparable sales Mr. Wold used in his sales comparable approach were two properties

apiece in Juneau and Ketchikan.  He noted that there has been only one hospitality property

constructed in southeast Alaska in the last five years, and possibly going back ten years, located

in Haines, Alaska.

Both Ms. Dinneen and Mr. Wold testified regarding their appraisals at the March 8, 2016

hearing.  First Bank also introduced the appraisal review report and testimony of Erik Bjorn-

Roli, MAI, with reference to Ms. Dinneen's updated valuation of the Inn.  Mr. Bjorn-Roli's

testimony and appraisal review report highlighted legitimate areas of concern with respect to the

credibility and reliability of Ms. Dinneen's methodology, and the $2.8 million value she placed

on the Inn.  Mr. Bjorn-Roli did not, however, give his own opinion of value for the Inn.  First

Bank also attacked the accuracy of the debtors' unaudited 2015 Profit and Loss Statement, and

the debtors' projections as to the future viability of the business.

The opinions of value offered by the parties are constrained by reality.  The Inn has been

listed for sale for several years.  Mr. Bellows testified that he originally listed it with a realtor

at $3.6 million, and dropped the list price to $3.2 million before switching realtors and dropping

the list price to $2.8 million.  In May, 2015, Mr. Bellows further reduced the list price for the Inn

to $2.4, though this excludes the tidelands property.[32]  There have still been no offers at this

price.  He is aware, however, of at least two parties who have shown an interest in buying the

property, including the float.  When examined at the hearing, Mr. Bellows stated that he was

prepared to sell the "whole operation" for between $2.4 and $2.5 million, provided he would be

permitted to continue to operate Air Sitka from its current location for at least two more years.

---

[32] The Inn is listed $2.4 million, and the tidelands lease for $400,000.  *See* ECF No. 31.

The evidence presented at the hearing supports a finding that the Inn is worth more than Mr. Wold's appraised value of $1,750,000.00.[33]  Both Mr. Bellows and First Bank's loan officer, Mr. Weber, testified that they were aware of recent inquiries to purchase the Inn for more than this appraised value.  Further, a 2011 appraisal obtained by First Bank valued the property at $2,050,000.00.[34]  Mr. Bellows testified that improvements had been made to the Inn, as well as its operations, since then.

All the valuation experts acknowledged the difficulty in valuing the Inn, given its unique market and location.  Fortunately, the court is not being asked to determine the specific value for the property, but rather to test the feasibility of the debtors' projection that they can sell the Inn for a sufficient price to fund the obligations under the Plan.  This is an easier task, and one that the debtors have met.  Given the overall testimony, and considering the interest expressed in purchasing the business since First Bank initiated foreclosure, the court finds that the Inn has a value greater than the $1,750,000.00 attributed by Mr. Wold.  Rather, this figure represents low liquidation value for the business, in a distress sale.  The property is well maintained, and functioning at its highest and best use, in a stabilizing tourist market.  The recent, positive changes in the Inn's operation can only serve to improve the viability of the business and increase its value as a going concern.  Ms. Dineen's valuation is similarly not supported by the facts, including the debtors' inability to sell the Inn at $2.4 million while listing the tidelands for $400,000.

The court accepts Mr. Bellow's opinion that the "the whole operation" might sell for $2.4 million to $2.5 million, given the time sought in the Plan.  Given the uniqueness of this property, however, a sale at this price in today's market would require a perfect set of circumstances.  The

[33] Each of the witnesses opining on value recognized the unique nature of the property, and the inherent difficultly in determining value with any certainty in such situations.  Ultimately, the value will be determined in the context of a sale of the property.

[34] *See* Mot. for Relief From Stay, ECF No. 41 at 7.

court, therefore, finds the current value for the property and business to be $2.2 million. This finding is buttressed by the testimony indicating interest in the property during the prepetition foreclosure process for more than Mr. Wold's $1.75 million valuation.[35] As a going concern, the Inn is worth more than this sum, although not $2.8 million.[36]

A sale of the Inn today at $2.2 million, or even $2.5 million, would be problematic. Assuming Ms. Hanson intends to enforce her interest, such a sale would not generate sufficient funds to pay all secured creditors. And even if she intends to "walk away," as Mr. Bellows asserts, a sale at either price today would be insufficient to pay not only the junior secured creditors in full, but also all priority debt as required by 11 U.S.C. § 1129(a)(9)(C)(ii).[37] This scenario would render the Plan unfeasible. However, the debtors project a sale of the Inn in 2021, after paying all priority debt and paying down their secured debt. To the extent that the debtors pay off the priority tax creditors through their operations, a sale between $2.2 and $2.5 million at that time would be sufficient to fund their plan obligations.

Based upon the present value of the Inn, the court finds the Plan to be feasible as a five year plan that pays off all priority debt, provides First Bank with a realistic balloon payment that is adequately secured by its collateral, and provides opportunities for the junior secured and general unsecured creditors to be paid. If the debtors perform as projected, the value of the Inn should increase over the Plan term. The court finds this projection realistic. It agrees with Mr.

---

[35] "[M]arket value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very *antithesis* of forced-sale value." *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537 (1994)(emphasis in original).

[36] Again, reality confines the court's reliance of the valuation testimony. The debtors have unsuccessfully marketed the property and business at $2.8 million for some time. While the bankruptcy proceeding may have dampened interest for the property, the lack of any offers or negotiations during the bankruptcy is equally telling.

[37] Section 1129(a)(9)(C)(ii) requires priority tax claims to be paid in full over a period of not more than five years. Because the sale of the Inn terminates the debtors' business, they must pay all priority tax claims in full from the sale unless they are paid prior to the sale.

Bellows that, ultimately, the Inn may well sell for $2.4 million or more. Looking at the totality of the evidence, the court finds that the Plan satisfies the feasibility requirement.[38] The debtors have demonstrated a reasonable probability that they will be able to sell the property for a sufficient amount within the allowed period to perform their plan obligations.

### c.  First Bank's Miscellaneous Arguments Concerning Feasibility.

The other points raised by First Bank as to feasibility are not significant. The bank notes that the debtors' Plan proposes to disallow the insider claim of Mr. Bellows' mother. Mrs. Bellows filed Proof of Claim No. 2-1 as a general unsecured claim for $88,000.00. It is unclear how disallowance of an unsecured claim imperils the feasibility of a plan. Given this creditor's insider status, a more legitimate concern would arise if the Plan proposed to give this claim special treatment. It does not.

First Bank also takes issue with the treatment of Carla Green's secured claim. Ms. Green is Mr. Bellow's former girlfriend, and managed the Inn for a period of time. She has not filed a claim in this bankruptcy, but she is scheduled as a secured creditor. Mr. Bellows testified that Ms. Green was not paid for a period of the time that she managed the Inn. Her secured claim is for this unpaid work, and Mr. Bellows said documents, including a deed of trust, evidence her claim. First Bank's Motion for Relief from Stay supports this assertion; it indicates that Ms. Green's deed of trust, to secure the sum of $68,000.00, was recorded on the Inn property on May 19, 2014, more than a year prior to the bankruptcy filings.[39] Under the Plan, Ms. Green is

---

[38] If the Inn sold for $2.4 million on January 31, 2021, the debtor projects $173,000.00 to be available to unsecured creditors, providing a dividend of roughly 40% (based on the Disclosure Statement's estimate of roughly $422,000.00 in unsecured claims). *See* Revised Ex. 8 to Disclosure Statement, ECF No. 59-1. For the reasons stated Section II.A, the court finds this misleading, based upon the present record, because it does not account for Ms. Hanson's interests in the assets. The point remains, though, that the Plan is feasible to the extent that all priority debt is to be paid by the time the sale occurs, and the junior unsecured creditors have agreed to accept whatever proceeds remain net of senior interests. Ms. Hansen's interests affect the projected distribution to unsecured creditors, however. This point must be clarified before the Disclosure Statement may be approved, and by extension, any plan confirmed.

[39] *See* Mot. for Relief From Stay, ECF No. 41 at 5.

a Class 4 creditor whose claim is impaired.  Her claim is junior to that of First Bank.  She will not receive any payments under the Plan until July 2017, and the cramdown interest rate on her loan is set at 3%, or half of that proposed for First Bank.  Under the circumstances, particularly considering that no other creditor has filed a similar objection, the treatment of Ms. Green's claim is immaterial to plan feasibility.

### 2.    Fairness and Cramdown.

Class 2, consisting of First Bank, is an impaired class that has not accepted the Plan. Consequently, the debtors' Plan must satisfy the "cramdown" requirements found in § 1129(b), specifically, that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."[40]  First Bank is the only impaired creditor who objects to confirmation.  It does not argue that there is unfair discrimination between impaired classes, but contends the Plan does not offer fair and equitable treatment of its claim.

For a secured creditor, the fair and equitable requirement is satisfied if any one of the three alternatives set out in § 1129(b)(2)(A) is satisfied.[41]  The debtors' Plan applies the first alternative, found in § 1129(b)(2)(A)(I).  To satisfy this alternative, the Plan must provide:

> (I)   that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II)   that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property[.][42]

---

[40] 11 U.S.C. § 1129(b)(1).

[41] *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 653; *see also* 11 U.S.C. § 1129(b)(2).

[42] 11 U.S.C. § 1129(b)(2)(A)(I).

18

The Plan satisfies the first requirement.  First Bank will retain the liens securing its claim, and the Plan proposes to pay its claim in full.  First Bank objects, however, because the Plan proposes to reduce the applicable interest rate on its loan from 7% to 6%, reduce the monthly payment amount from $18,500.00 to $18,000.00, and extend the maturity date on the loan for just over two years, or 26 months.  It argues the extension of the loan maturity date and the reduction in interest rate are unfair.  It says the extension of the loan term requires close scrutiny, and notes that it has previously reduced the applicable interest rate from 9.5% to 7%, and extended the maturity date to December 5, 2018.  First Bank contends the debtors have offered inadequate explanation for these adjustments to its loan, which it says place too much of the risk associated with the Plan on it.

The debtors, as plan proponents, bear the burden of proof on all elements required for confirmation.[43]  In the context of determining the appropriate interest rate in a cramdown situation, the burden generally shifts to the objecting creditor.[44]  However, when a debtor fails to show that the interest rate it offers is fair and equitable, it fails to satisfy its ultimate burden to establish that the Plan satisfies all the confirmation requirements of § 1129(b).[45]

The appropriate interest rate is to be determined on a case-by-case basis.[46]  In the Ninth Circuit, courts apply the "formula rate" approach to determine the appropriate interest rate on

---

[43] *In re Arnold and Baker Farms*, 177 B.R. at 654.

[44] *See Pineda Grantor Trust II v. Dunlap Oil Co., Inc. (In re Dunlap Oil Co., Inc.)*, 2014 WL 6883069, at *20 (B.A.P. 9th Cir. Dec. 5, 2014)(citing *Till v. SCS Credit Corp.*, 541 U.S. 469, 479 (2004))*; In re Tapang*, 2014 WL 7212959, at *2 (Bankr. N.D. Cal. Dec. 17, 2014)("the creditor bears the burden of proof with respect to the appropriate risk premium in the chapter 11 cramdown context."); *In re Warwood*, 2013 WL 1724065, at *5 (Bankr. D. Mont. Apr. 22, 2013)(citing *Till*, 541 U.S. at 479).

[45] *In re Detienne Assoc. Ltd. P'ship*, 2005 WL 6960997, at *7 (Bankr. D. Mont. Jul. 29, 2005).

[46] *United States v. Camino Real Landscape Maint. Contr., Inc. (In re Camino Real Landscape Maintenance Contr., Inc.)*, 818 F.2d 1503, 1508 (9th Cir. 1987); *Pacific First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.)*, 164 B.R. 99, 105 (B.A.P. 9th Cir. 1994).

19

a deferred payment obligation under cramdown,[47] or, where applicable, the market rate of interest.[48]  The contract rate of interest "may be evidence of the proper rate for a plan, but it is not conclusive."[49]

In a reorganization context, it is not unreasonable to extend the loan for an additional 26 months, as provided under the Plan.  Nor is it unreasonable to adjust the payment schedule in this situation.  The loan payments already skip for the months of January through March.  The change only affects which months are skipped – December through February –  rather than the number of months of payments.  In the instant case, however, the Plan's proposed interest rate cannot be approved based upon the record as it exists.  Neither the debtors, nor First Bank, offered evidence as to an appropriate cramdown interest rate.  Nor did the debtors explain why a reduction of the contract interest rate was appropriate.  Given the absence of any such evidence, in the face of First Bank's objection, the court would not be able to confirm the Plan even if it had approved the debtors' Disclosure Statement.

## C.    Relief From Stay.

First Bank seeks relief from stay under § 362(d)(2), on the ground that there is no equity in the debtors' property and, since the debtors ultimately seek to sell the property in any event, the property is not necessary for a reorganization.  In light of the above findings regarding

---

[47] *In re Boulders on the River*, 164 BR at 105.

[48] *In re Tapang*, 540 B.R. 701, 707 (Bankr. N.D. Cal. 2015) (citing *In re Dunlap Oil Co., Inc.,* 2014 WL 6883069, at *19); *see also In re Seasons Partners, LLC,* 439 B.R. 505, 517 (Bankr. D. Ariz.2010) ("Some courts calculate the permissible interest rate for a Chapter 11 plan using a 'formula' approach, *i.e.,* starting with a base rate – such as the prime rate or the rate on treasury obligations – and adding a risk factor.") (citing *In re Camino Real Landscape Maint. Contractors,* 818 F.2d at 1508); *Official Unsecured Creditor's Comm. v. K&B Capital, LLC (In re LWD, Inc.),* 332 B.R. 543, 556 (Bankr. W.D. Ky. 2005), *aff'd,* 340 B.R. 363 (W.D. Ky. 2006); *Wells Fargo Bank Nat'l Ass'n v. Texas Grand Prairie Hotel Realty, L.L.C. (In re Texas Grand Prairie Hotel Realty, L.L.C.,* 710 F.3d 324, 333 (5th Cir.2013) ("[T]he vast majority of bankruptcy courts have taken the *Till* plurality's invitation to apply the prime-plus formula under Chapter 11.").

[49] *In re Warwood*, 2013 WL 1724065, at *5.

valuation and feasibility within the confirmation context, the court finds that there is equity in First Bank's collateral, and that the property is necessary to the debtors' reorganization. Accordingly, the court will deny the Motion for Relief From Stay.

## CONCLUSION

The Disclosure Statement fails to address Marlys Hanson's interests in the real property, the debtor entity FIFII, and the Pilot House. Nor does the Disclosure Statement discuss Ms. Hanson's expectations on sale, or explain how her interests and expectations would affect any distribution on sale of these assets. For these reasons, the court must deny final approval of the Disclosure Statement.

Although denial of the Disclosure Statement precludes confirmation, the court finds that the Plan as proposed would be feasible based on the current valuation of the Inn at $2.2 million. The debtors' business projections are supported by the record, and there is a realistic prospect that the Inn would sell at a sufficiently higher price at the end of five years to pay all necessary obligations under the proposed Plan. These findings require denial of First Bank's Motion for Relief from Stay. The court also notes that First Bank has objected to its treatment and the debtors have offered no evidence to support the cramdown interest rate provided in the Plan for the bank's claim.

For these reasons, the court will deny final approval of the Disclosure Statement, and confirmation of the debtors' Plan. First Bank's Motion for Relief from Stay is also denied. A status conference will be promptly scheduled to determine how the parties would like to proceed.

An order will be entered consistent with this Memorandum.

21

DATED:  July 19, 2016.

BY THE COURT

 /s/ Gary Spraker                           
GARY SPRAKER
United States Bankruptcy Judge

Serve:  D. Bundy, Esq.
        A. Bell, Esq.
        B. Moore, Esq.
        D. Fenerty, Esq.
        J. McGowen*
        T. Buford, Esq.
        U. S. Trustee
        SVS

*  *courtesy copy served via email* 7/19/16 - √ aam.